UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | |
| ) | Criminal No. 04-10087-MBB |
| BOUCHARD TRANSPORTATION ) | |
| COMPANY, INC., ) | |
| ) | |
| Defendant. ) | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The government hereby submits this Memorandum in support of the sentence set forth in the binding plea agreement between the defendant, Bouchard Transportation Company, Inc. ("BTC"), and the government. The plea agreement is the product of months of negotiation between BTC and the United States Attorney's Office, as well as the numerous federal, state and local agencies that participated in either the clean-up or the investigation of the Buzzards Bay Oil Spill. The plea agreement achieves the government's core objectives in prosecuting BTC for its role in the spill; that is, to enforce and vindicate federal law; to hold BTC responsible for conduct that caused extensive, yet avoidable, damage to the environment and the economy of Southeastern Massachusetts; to prevent future oil spills of this type, not only by BTC but by any company in the industry; and to redress the ecological damage to the Buzzards Bay Watershed. In addition, the plea agreement reflects BTC's admission of guilt and cooperation in the clean-up of the spill and the investigation that ensued.

Part I of this Memorandum summarizes the damage caused by the spill, addresses BTC's culpability, and explains how the plea agreement advances the objectives enumerated above. Part II explains the basis for the parties' agreeing that the fine attributable to Count 2 of the

Information, charging a violating of the Migratory Bird Treaty Act, should be deposited into the North American Wetlands Conservation Act Fund to support eligible wetland conservation projects, and why the Court should recommend emphatically that the money be used to restore wetland habitats in the area affected by the spill. Finally, Part III addresses why, in the view of both the government and BTC, the Probation Office's determination that the maximum fine under Count 2 is $15,000 is incorrect, which, if adopted by the Court, would require the Court to reject the parties' plea agreement and force the parties to begin their negotiations all over again.

I. **The Sentence Set Forth in the Plea Agreement Achieves the Government's Objectives in Holding BTC Accountable and Deterring Future Negligence by BTC and Others in the Oil Shipping Industry.**

The plea agreement imposes on BTC a stern punishment for negligent conduct that caused extensive economic and ecological damage. Because the fine would be the highest ever in a New England oil spill case, it would raise the stakes on companies in the industry that might be tempted to cut corners at the expense of safety. The plea agreement also requires strict compliance measures designed to address the root causes of the spill, and it reflects BTC's cooperation in the clean-up effort and the follow-up investigation.

   A. **The Buzzards Bay Oil Spill Caused Widespread Damage to the Environment and Economy of Southeastern Massachusetts.**

On the afternoon of April 27, 2003, the BTC barge *B-120* struck a rock outcropping to the west of the First Buzzards Bay Buoy, having veered outside Buzzards Bay Channel. The vessel was carrying approximately 4.1 million gallons of Number 6 heating oil from Philadelphia to the Mirant Canal Generating Plant on the Cape Cod Canal. The impact of the barge striking the rocks ripped a twelve-foot long gash slightly to the starboard side of the bottom of the vessel.

The hole in the hull, which was constructed of thick steel, was as wide as one foot and up to twenty-one inches deep. The damage caused by this collision with the reef was limited to the Number 2 tank, one of ten tanks in all. As a result of the collision, tens of thousands of gallons of the No. 6 oil, a thick, viscous oil used in power plants, were released into Buzzards Bay, a spill that eventually grew to 98,000 gallons.

The discharge of the oil was devastating to the fragile bird population on the Southeastern Massachusetts coast. Within weeks of the spill, 478 federally-protected birds were recovered dead from the spill. According to the U.S. Fish and Wildlife Service, a far greater number likely perished and sank at sea. More than half of the recovered dead birds were Common Loons, Red Throated Loons, Common Eiders or Black Scoters. Oil from this spill also caused the death of a wide variety of other protected birds, including Black Backed Gulls, Dunlins, Herring Gulls, Long-tailed Ducks, Black Ducks, Buffleheads, Canada Geese, Common Terns, Gannets, Greater Scaups, Mergansers, Grebes, Swans, Razorbills, Scoters, Willets and Yellowlegs. Only a small number of birds that came into contact with the No. 6 oil from the spill were rehabilitated and returned to the wild.

The spill also forced the immediate closure of thousands of acres of shellfish beds in Buzzards Bay, a large portion of which remained closed for several months following the oil spill. As depicted on the map attached as Exhibit 1, oil from the *B-120* affected nearly ninety miles of Southeastern Massachusetts beaches and coastline, affecting a variety of local businesses that depend on beach traffic. The total cost of cleaning up this oil spill is still being determined and it is expected to be in excess of forty million dollars. The spill also consumed thousands of man-hours of volunteers across the region, who worked feverishly to clean beaches

and treat wildlife exposed to the oil. The long-term impact of the spill, in terms of marine life, the bird population and the overall ecology of Buzzards Bay will not be known for several years.

### B. If BTC Had Taken Certain Precautions, Especially in Dealing with a Mate that Was Prone to Accident, the Spill Would Not Have Happened.

The oil spill that gave rise to this case was avoidable. April 27, 2003 was a clear, calm day on Buzzards Bay. The entrance to the channel was clearly marked by the so-called First Buzzards Bay buoy. Maritime traffic was light. There were no mechanical problems with BTC tug, *Evening Tide*, which was towing the *B-120*. The vessel was equipped with standard navigational and communication equipment, including up-to-date maps and operating radios. In short, the vessel was fully equipped and capable of safely sailing Buzzards Bay, a trip that BTC and other barge operators make routinely without incident, even at night.

Despite these favorable conditions, the first mate of the *Evening Tide*, who was at the helm as the vessel entered Buzzards Bay that day, failed to navigate the vessel with the care that would be expected of a reasonable mariner under the circumstances. Evidence gathered by the government reveals that the mate made several critical errors in judgment that caused the tug and barge to veer outside the clearly marked shipping channel. First, as the tug approached the entrance to Buzzards Bay, the mate decided to pull in the tow wire, a step that required him to attend to the tow winch at the stern of the vessel, while piloting the vessel from the aft controls.[1] Because the view of the front of the vessel is obstructed by the pilot house, a reasonable seaman does not remain long at the aft controls and would post another crew member to serve as a

---

[1] A shorter tow, general speaking, increases a tug's control of a barge and is advantageous closer to land where sea lanes are tighter; whereas, a longer tow is useful in open ocean water, where rolling seas call for more slack.

4

forward lookout. The mate took neither of these precautions. He spent an unduly long time at the aft controls as the vessel approached the entrance to Buzzards Bay and he neglected to summon any of the other crew members to watch where the vessel was heading. It was during this time that the vessel began to veer out of the shipping channel.

Despite these mistakes, the mate still could have averted the impending disaster had he maintained constant internal and external radio contact, as is expected of someone in his position. Had he done so, he would have received warning calls from the crew of the *Carl Ray*, a nearby tug whose crew was witnessing the *Evening Tide* veer off course. And at no time did the mate avail himself of the ultimate safety measure as he was attempting to bring in the tow, namely to call the captain for help. In short, the mate failed to appreciate the situation at hand until it was too late.

BTC should have been aware that the mate ought not to have been entrusted with the responsibility of navigating a tug and oil barge through a near-shore, ecologically sensitive waterway like Buzzards Bay. The mate had been involved in earlier incidents that raised questions about his competence, including a March 13, 2003 incident in which he caused a barge to collide with a dock in Philadelphia. BTC captains that had worked with the mate had voiced their concerns to the company about his competence. By the time the Evening Tide departed Philadelphia for Buzzards Bay on April 24, BTC should have known that the mate posed a rise of accident, and yet the company failed to remove him.

### C. The Sentence Under the Plea Agreement Achieves the Government's Objectives in Holding BTC Accountable and Preventing Future Spills.

The plea agreement seeks to accomplish the government's objective in holding BTC accountable and preventing future spills in two principal ways. First, BTC will suffer a significant punishment. It has agreed to pay a fine of $10 million which, as noted above, would be the largest fine ever imposed for an oil spill in New England. Given also that the company likely will pay in excess of $50 million in clean-up costs, civil damages, and administrative penalties, the additional cost of a criminal fine will be felt by the company for years.

The fine also raises the stakes for others in the industry that might engage in similar conduct. This fine exceeds the $7 million fine imposed on Eklof Marine, another oil shipping company whose barge *North Cape* spilled 828,000 gallons of oil off Rhode Island in 1996, as well as the $1 million fine imposed in connection with the *World Prodigy* spill off Rhode Island in 1989, in which just under 300,000 gallons were spilled. The plea agreement's ratcheting up of the penalties in these types of cases reflects not only the more egregious ecological impact of the Buzzards Bay Oil Spill, but also the government's interest in conveying unequivocally to the oil shipping industry that it will not countenance negligence in a business that transports large quantities of cargo as hazardous to the environment as No. 6 heating oil.

A large criminal fine also is critical in this case in light of just how much more devastating the spill could have been. When the *B-120* ran aground, it was carrying 4.1 million gallons of No. 6 heating oil in ten separate tanks. Only one tank was punctured. As large as the 98,000 gallon spill was, it easily could have been catastrophic. Through the plea agreement, the government seeks to encourage the industry to eliminate the risks that produced this spill,

because next time, we might not be as lucky.

The plea agreement also requires BTC to comply, as a condition of probation, with several important remedial measures aimed at the causes of the spill. These measures have been developed through extensive consultation with the Coast Guard's Marine Safety Office and Legal Office. One of the most significant measures is that BTC will be required, for the next three years, to hire a local pilot for all trips, north and south, through Buzzards Bay. This pilot, who will be experienced in these waters, will board all BTC tugboats that are traveling through Buzzards Bay towing a loaded, single-hull barge. The purpose of this requirement is to ensure that the person steering the vessel is intimately familiar with the potential hazards in these areas.

The other remedial measures are aimed at mandating compliance with certain basic maritime rules, for instance:

- the company must prepare and comply with an extensive compliance program designed to address the operational deficiencies unearthed during the course of the investigation, such as the hiring of mates and captains, the training program for new employees, and the evaluation system for mates and captains;

- all BTC vessels will be required to maintain radio contact at all times, essentially mandating the use of handheld radios on the vessels;

- the company will be required to place a crew member inside the wheelhouse at all times (again, addressing one of the deficiencies that contributed to this accident); and

- BTC will configure its on-board computers so that the software stores in memory the routes that are actually traveled by a BTC tugboat (as opposed to the planned route) for a period of ten days to facilitate future investigations into other oil spills or maritime incidents.

Lastly, as noted above, BTC has agreed to waive its attorney client/work product

privileges and has produced the results of its internal investigation into the accident to the government. This cooperation has been useful in assisting the government's effort to determine what exactly happened and to hold accountable those who were responsible for the spill. The sentence agreed to by the parties reflects the credit BTC deserves for this cooperation.

**II.    The Contribution of the Fine to the NAWCA Fund and the Government's Proposed Judgment and Commitment Order.**

The plea agreement's allocation of the fine money between Count 1 of the Information, charging BTC with violating the Clean Water Act ("CWA"), and Count 2, charging a Migratory Bird Treaty Act ("MBTA") violation, reflects the damage caused by the spill to the local ecology of Southeastern Massachusetts. The $2 million dollars attributed by the plea agreement to the CWA count would be directed, pursuant to 33 U.S.C. § 1321(s), to the Oil Spill Liability Trust Fund, which is designed principally to fund the clean-up of oil spills where the responsible party is unknown. See Paragraph 5.B. The parties have agreed to attribute most of the fine to the MBTA count because the particularly acute impact on near-shore bird habitats demands that the interests underlying the MBTA principally be vindicated in this case. Put another way, if the spill occurred farther out to sea and had affected fewer migratory birds or their habitats, the interests underlying the MBTA would have been implicated to a lesser degree and accordingly, more of the fine would properly be allocated to the CWA count.

The parties agreed in the plea agreement that the MBTA fine would be directed into the North American Wetlands Conservation Act ("NAWCA") Fund to support eligible wetlands conservation projects. For the reasons set forth below, in accepting the plea agreement, the Court also should emphatically express its view that the fine ought to be spent on projects designed to

preserve the habitats that suffered the brunt of the spill.

### A.    The NAWCA Fund.

In Paragraph 5.B. of the plea agreement, the parties agreed that $7 million of the $9 million non-suspended fine would be attributable to Count 2 and it be directed, pursuant to 16 U.S.C. 4406(b), into the NAWCA Fund to support eligible wetlands restoration projects. Congress enacted the NAWCA in 1989 to protect, restore and manage wetland ecosystems throughout North America. See section 4401(a)(1). Its cental feature is a fund that is supported largely by Congressional appropriation and fines imposed under the MBTA, from which money is distributed to eligible wetland restoration projects. In most instances, the projects' proponents are conservation organizations, and the projects typically entail the purchasing of wetlands, coupled with promises by the proponent to manage them in perpetuity. See section 4402(9). Section 4404 sets forth a set of rigorous eligibility requirements, which include a demonstration that the project will be supported by substantial matching commitments of non-Federal money.

Funding decisions are made annually by the NAWCA Council, a nine member board comprised of representatives from government and non-governmental conservation organizations, most of whom are appointed by the Secretary of the Interior. See section 4403. The council maintains its own staff which reviews thoroughly all eligible projects. Projects are also vetted by the U.S. Fish and Wildlife Service ("USFWS"), which manages the program.

### B.    The Court Should Strongly Recommend that the Money Be Used to Fund Eligible Wetlands Projects in the Buzzards Bay Watershed.

At sentencing, the government will urge the Court, without objection from BTC, to recommend that the NAWCA Council direct the fine monies to habitat preservation projects in

9

the Buzzards Bay Watershed area, the region that bore the full brunt of the oil spill. Although it will be years before all the damage will be fully assessed, no one disputes that the spill caused widespread harm to a variety of ecosystems on the Northcoast of Buzzards Bay. The Department of the Interior predicts that its assessment of the spill's damage to natural resources, which will take years to complete, will total in the tens of millions of dollars. How much BTC will be forced to pay for this damage through civil or administrative mechanisms will not be known for years. Nevertheless, no one disputes that there is an immediate need to support the habitats in the Buzzards Bay Watershed to remedy the damage done by the spill.

The mechanism to support these habitats is in place. On July 31, 2004, the Buzzards Bay Watershed Partners ("BBWP"), a coalition of twenty-five local and national conservation organizations, as well as the municipalities most affected by the spill, submitted project proposals to the NAWCA Council. The projects propose the spending of $6.2 million to acquire over a thousand acres of wetlands throughout the Buzzards Bay Watershed. The wetland parcels designated in the proposals are habitats for many of the species of water foul that fell victim to the spill. The USFWS has worked with the BBWP in crafting its proposals to the NAWCA Council, and USFWS confirms that the group's proposals meet the NAWCA eligibility requirements. The BBWP's proposals are summarized in Exhibit 2. The summaries illustrate the high degree of planning in the development of the projects, as well the deep base of public and private sector commitment to them. Each of the proposals was developed to advance the goals of the NAWCA.

According to USFWS, a recommendation from the Court that NAWCA Council direct the fine monies to the Buzzards Bay projects likely will tip the scale in their favor without

10

divesting the Council of its proper role in selecting projects for funding based on merit. Thus, the government urges the Court to adopt the following language in its Judgment and Commitment Order:

> The defendant shall be fined as follows:
>
> $2,000,000 for violation of the Oil Spill Control Act of 1990, 33 U.S.C. § 1321(b)(3), which funds shall be directed to the Oil Spill Liability Trust Fund pursuant to 33 U.S.C. § 1321(s); and
>
> $8,000,000 for violation of the Migratory Bird Treaty Act, 16 U.S.C. §§ 703, 707(a), which funds shall be directed to the North American Wetlands Conservation Act Fund pursuant to 16 U.S.C. § 4406(b) to fund eligible wetlands conservation projects, $1,000,000 of which shall be suspended pending the defendant's successful compliance with the conditions of its probation, including those set forth in the plea agreement.[2]
>
> The Court strongly recommends that the fine monies paid into the North American Wetlands Conservation Act Fund be used to fund eligible wetland conservation projects in the Buzzards Bay Watershed Area of Massachusetts.

By "recommending," instead of "ordering," that the money be spent in the Buzzards Bay Watershed, the Court will not supplant the NAWCA Council's role as the final arbiter of funding decisions under the NAWCA. By limiting the recommendation to "eligible" projects, the order would not suggest that NAWCA Council do something it is not authorized to do. Much like the routine placement recommendations courts make to the Bureau of Prisons, so too can this Court recommend how the NAWCA Council should spend the fine money in this case as a way of expressing its sense that funding the Buzzards Bay projects is in the public's best interest.

What the government is asking the Court to do is fundamentally the same as what the

---

[2] The plea agreement is silent as to which count the $1 million suspended portion of the fine should be attributed. The government contends, for the reasons set forth in this part of the memorandum, that it should be attributable to Count 2.

11

court in the 1998 *North Cape* spill case did. In that case, the Court ordered that fine of $3 million be directed to the NAWCA Fund to support wetland restoration projects "with emphasis in the District of Rhode Island" (A copy of the Judgment and Committal Order from that case is attached as Exhibit 3). Shortly thereafter, the NAWCA Council decided to direct all of the fine money to fund conservation projects along Narragansett Bay, near the site of the spill.

The language the government proposes in this case is based on this model. By adopting the proposed language, the Court will facilitate significantly the rehabilitation of the habitats that were devastated by the Buzzards Bay Oil Spill. More fundamentally, it will affirm the notion that out of fairness, the area that suffered the most from the spill, namely the Southeastern Massachusetts coast, ought to receive the greatest benefit from a government program that seeks to redress spills like this one. Indeed, this is a unique opportunity to rebuild where tragedy struck.

### III. The Potential Benefits of the NAWCA Program Will Not be Realized If the Court Adopts Probation's Position that the Maximum Fine the Court May Impose on Count 2 is a Mere $15,000.

The potential benefits of the fine in the area that bore the full brunt of the spill will not come to pass if the Court adopts the Probation Office's position that the maximum fine on Count 2 of the Information is $15,000. The position is based on an unduly narrow reading of the general fine statute, 18 U.S.C. § 3571. Subsection (c) of the statute, "Fines for Organizations," provides that the maximum fine for a single offense is the highest of the amount specified in the offense statute ($15,000 for the MBTA), $10,000 for a Class B misdemeanor like the MBTA, and the applicable amount under subsection (d), entitled "Alternative Fine Based on Gain or Loss." Subsection (d) essentially provides that the maximum fine is equal to twice the loss

12

caused by the offense. The loss is this case is substantial, as it includes not only the damage to the ninety miles of shore line affected by the spill, but the loss of hundreds, if not thousands, of birds and their habitats, as well as the lost profits of the regions's shell fishermen and other businesses. Although the Department of the Interior, along with the Coast Guard and local authorities, are in the process of calculating the loss under the National Resource Damage Assessment ("NRDA") process, the parties agree for the purpose of their plea agreement and sentencing, that the loss will be at least $5 million. Under the alternative fines statute, this loss would support a maximum fine of $10 million for each count.

Probation rejects this line of reasoning. It maintains instead that the Court may consider only the loss of the single bird alleged in Count 2 to have been killed as a result of spill, to the exclusion of the hundreds of other birds that were killed as well their destroyed habitats. Under Probation's reasoning, the loss is equal to the value of the life of that bird. Assuming (incorrectly) that the value is either negligible or not ascertainable, Probation concluded that under section 3571(c), the highest maximum fine is that imposed under the MBTA itself, namely $15,000.

This formalistic interpretation of the fine statute not only disregards almost completely the devastation caused by the spill, but it is also legally unsupported. For starters, it overlooks the fact that all of the loss associated with the spill is in fact alleged in Count 2 by virtue of Paragraph 37, which states that "Paragraphs 1-34 are realleged and incorporated by reference as though fully set forth herein." Thus, the entire narrative of the Information, which describes in detail the damage done by the spill, appears in the formal charging language. According to Probation's own reasoning, the Court should treat all of the damage as "loss" under the

13

alternative fine statute.

Probation's approach also is based on the notion that since the Sentencing Guidelines, and in particular their relevant conduct provisions, do not apply to the case, the Court may not consider any related loss not stated in the formal charging language. There simply is no authority for this narrow interpretation. In fact, the general sentencing provisions of 18 U.S.C. § 3553, which apply to every federal sentence, *require* a broad, unbounded approach:

> The court, in determining the particular sentence to be imposed, shall consider . . . (1) the nature and circumstances of the offense . . . ; (2) the need for the sentence imposed . . . to reflect the seriousness of the offense . . . .

Nothing in the language of Section § 3553 even implies that a court undertake the narrowly bounded approach adopted by Probation.

In the two other oil tanker spill prosecutions involving MBTA violations, 1996 the *North Cape* spill off of Rhode Island and the 1989 *Exxon Valdez* spill off of Prince William Sound, Alaska, the courts accepted plea agreements in which the parties agreed that the loss associated with the MBTA violations encompassed all the loss caused by the spill – birds, habitats, everything. In the Exxon case, the Court accepted a plea agreement in which the full loss of the spill was attributed to each of the five counts of the information, including the MBTA count. See In re the Exxon Valdez, 296 F.Supp. 1071, 1103 (D. Alaska January 28, 2004) (noting that the maximum criminal fines for each count of conviction, including an MBTA count, were based, under the alternative fine statute, on the full loss caused by the spill, which was $507.5 million). In United States v. Eklof Marine Corporation, et al., Cr. No. 97-105 (D. R.I. 1997), which arose out of the *North Cape* spill, the Court accepted a plea agreement whose fine attribution language is nearly identical to that in Paragraph 5.B. of the plea agreement in this case. In the Eklof plea

agreement, the parties agreed to attribute virtually all of the fine in the case, exactly $3 million, to a single MBTA violation. See Eklof Plea Agreement, ¶ 2.a., attached hereto as Exhibit 4.

Probation responds that if the parties wished to support a higher fine, see Final PSR at 20, they should have pled the case differently. In other words, the parties could have captured more of the loss by charging BTC with the killing of all the dead *birds* instead of just one bird. That way, the Court could consider the value of all the birds, or at least the 478 confirmed dead birds. According to Probation, because the parties chose not to plead the case this way, they should not be able simply to agree that the loss is more than what the charging language supports.

This line reasoning runs dead into legal and practical obstacles. The government could not, consistent with the language of the MBTA, have charged the Bouchard with the killing of more than one bird. The MBTA states that "it shall be unlawful . . . to pursue, hunt, take, capture, kill . . . any migratory *bird*." See Title 16, U.S.C. § 703 (emphasis added). Because the statute's reference to migratory birds is in the singular, the charging language, as a matter of Due Process, must be drafted the same way.

The only alternative would have been, for practical reasons, absurd – to charge BTC with enough MBTA counts, one for each dead bird, such that the aggregated maximum fine would exceed the total fine to be imposed. In other words, to support the non-suspended fine of $8 million for violating the MBTA, the government would been required to charge BTC with 534 MBTA violations (i.e. $8 million divided by the statutory maximum of $15,000).

The Court should not reject the parties' Rule 11(c)(1)(C) plea agreement because they thought it unnecessary to stand on ceremony and have the government charge, and BTC plea to, 534 violations of the same statute. Rather, it should follow the precedents set in the Exxon and

15

Eklof cases, because the courts' decisions to accept the plea agreements in those cases were based on a sound interpretation of sections 3553 and 3771, and in order to promote consistency in applying the fine provisions in cases where, like this one, the Sentencing Guidelines do not apply. Predictability in punishment is critically important in negotiating multifaceted plea agreements in complex cases like this one. Months of negotiation should not be undone on an unsupported, technical distinction, particularly where the parties are in agreement and the point of contention will have no bearing on the total fine to be imposed.

## IV.   Conclusion

For the foregoing reasons, the United States urges the Court to adopt the plea agreement, impose the sentence set forth therein, and to adopt the government's proposed language in the Judgment and Commitment Order.

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

By: _____
JONATHAN F. MITCHELL
NADINE PELLEGRINI
Assistant U.S. Attorneys

PETER KENYON
Senior Criminal Enforcement Counsel
Environmental Protection Agency

Dated: September 10, 2004

CERTIFICATE OF SERVICE

This is to certify that I have this day served upon the person listed below a copy of the foregoing document by hand delivery:

> Mark A. Walsh, Esq.
> LeBoeuf, Lamb, Greene & MacRae, LLP
> 260 Franklin Street
> Boston, MA 02110

This 10th day of September, 2004

_____
JONATHAN F. MITCHELL
ASSISTANT UNITED STATES ATTORNEY