UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Criminal No. 04-10087-MBB |
| | ) | |
| v. | ) | Violations: |
| | ) | 33 U.S.C. §§1319(c)(1), 1321(b)(3) |
| | ) | (Clean Water Act) |
| BOUCHARD TRANSPORTATION | ) | 16 U.S.C. §§703, 707 |
| COMPANY, INC. | ) | (Migratory Bird Treaty Act) |
| Defendant. | ) | |

## SUPERSEDING INFORMATION

THE UNITED STATES ATTORNEY CHARGES THAT:

**The Clean Water Act and the Oil Pollution Act**

1. In the Federal Water Pollution Control Act (the "Clean Water Act"), as amended by the Oil Pollution Act, 33 U.S.C. §1321(b)(1), Congress has declared that it is the policy of the United States that there should be no discharges of oil or hazardous substances into or upon the navigable waters of the United States or the adjoining shorelines.

2. The Clean Water Act makes it a crime for a person to negligently discharge oil into or upon the navigable waters or contiguous zone of the United States, in such quantities as may be harmful. 33 U.S.C. §§1321(b)(3) and 1319(c)(1).

3. The Clean Water Act defines a "person" as an individual or a corporation. 33 U.S.C. §1321(a)(7).

4. The Clean Water Act defines a "discharge" as any spilling, leaking, pumping, pouring, emitting, emptying or dumping. 33 U.S.C. §1321(a)(2). The Clean Water Act defines "oil" as oil of any kind or in any form, including, but not limited to, petroleum, fuel oil, sludge and oil refuse. 33 U.S.C. §1321(a)(1).

5.      Federal regulations promulgated under the Clean Water Act define a "harmful" quantity of oil as including any discharges of oil that cause a film or sheen upon or discoloration of the surface of the water or adjoining shorelines or cause a sludge or emulsion to be deposited beneath the surface of the water or adjoining shorelines. 40 C.F.R. §110.3.

6.      The Clean Water Act defines the "navigable waters" of the United States as the waters of the United States and the territorial seas, which are defined to be water extending three (3) miles seaward of the low tide mark. 33 U.S.C. §§ 1362(7) and 1362(8).

**Background**

7.      At all times relevant to this Information, Bouchard Transportation Company, Inc. ("BTC") was a privately held, New York corporation with its principal place of business in Hicksville, New York.

8.      At all times relevant to this Information, BTC was in the business of the marine transportation of oil and other types of petroleum products, primarily by means of tugboats and barges. BTC's operations were centered along the eastern seaboard of the United States and the Gulf of Mexico.

9.      On or about April 27, 2003, a tugboat owned and operated by BTC, named the Evening Tide, was traveling en route from Philadelphia, Pennsylvania to Sandwich, Massachusetts. The Evening Tide departed from Philadelphia on April 24, 2003.

10.      During this trip, the Evening Tide was hauling a barge named the Bouchard B-120 (the "B-120") to the Mirant Canal Generating Plant located on the southern side of the Cape Cod Canal in Sandwich. The B-120, built in 1975, is a single-hull vessel that weighs 7,912 gross tons and is 376 feet long. The B-120 is comprised of ten separate tanks, five on the port side and five

on the starboard side of the vessel.

11.     The B-120 is an unpowered barge and it can only be moved with the assistance of a tugboat. The primary means by which a tugboat, such as the Evening Tide, moves the B-120 is either by towing it, using one of the two steel cables that extend off the stern of the tugboat, or by pushing the barge. The B-120 has a large, triangular shaped notch in her stern, which a tugboat like the Evening Tide can slip into in order to push the barge.

12.     On April 27, 2003, the B-120 was loaded with approximately 99,000 barrels of #6 oil, also known as Bunker C fuel. #6 oil is a thick, viscous and adhesive petroleum product that is primarily used by utilities and power plants. Measured in gallons, the B-120 was carrying more than four million gallons of # 6 oil as it traveled through Buzzards Bay on April 27, 2003. With the load it was carrying on this date, the draft of the B-120 (*i.e.* the depth to which the barge extended into the water) was approximately 25 feet, six inches.

13.     For this trip from Philadelphia to Sandwich, the Evening Tide had a crew of six individuals, comprised of a captain (the "Evening Tide Captain"), a mate, two deck hands, a chief engineer and an assistant engineer. The crew worked in six hour shifts, with each shift consisting of either the captain or the mate, one deck hand and one of the engineers. The unpowered B-120 was manned by a two-person crew, a captain and a mate, who worked in six hour shifts. As a general matter, the crew of the Evening Tide worked on the boat for three weeks at a time, followed by three weeks off.

14.     The mate on the Evening Tide (the "Evening Tide Mate") was hired by Bouchard as a mate in August 2002. The duties of the mate are to be in charge of all aspects of the tugboat operations during the twelve hours each day when the mate is on-duty and the captain is off-duty.

According to Bouchard's Responsible Carrier Plan, when on duty the mate is responsible for, among other things, "navigat[ing] the vessel in a safe and prudent manner . . . complying with all applicable U.S. Coast Guard Inland Navigation Rules." The mate must also "observ[e] [BTC's] look-out policy," by maintaining a "proper look-out by sight and hearing as well as by all available means appropriate in the prevailing circumstances and conditions so as to make a full appraisal of the situation and the risk of collision." The mate is also responsible for maintaining radio communications with other vessels during his watch.

15.     The Evening Tide Mate was initially assigned to the informal mate training program at Bouchard for a few weeks, in which he served alongside an experienced captain as an extra person during the captain's shift. The Evening Tide Mate was then promoted out of the training program to be a full mate aboard two other BTC tugboats -- the Ellen Bouchard and then the J. George Betz -- prior to being assigned to the Evening Tide. The BTC captains who worked with the Evening Tide Mate advised BTC's headquarters that they had doubts about the Evening Tide Mate's ability to handle the responsibilities of a mate in charge of a tugboat hauling an oil barge.

16.     Despite these negative reports about the Evening Tide Mate's competency, the Evening Tide Mate was only briefly re-assigned to the BTC mate training program in early 2003. The Evening Tide Mate was then assigned to serve as the mate aboard the Evening Tide beginning in February 2003.

17.     The Evening Tide Mate's problems continued on the Evening Tide. The Evening Tide Mate caused a barge to collide with the dock in Philadelphia in March 2003. Although there was no oil spill as a result of this incident, there was property damage to the dock. This

incident was reported to BTC's headquarters and the Evening Tide Mate admitted causing the accident because he misjudged the wind and current. The captain of the barge reported that the accident resulted from the Evening Tide Mate "closing on [the] dock at a fast rate" and making "corrections" that caused the barge to collide with the dock.

18. The Evening Tide Captain also called BTC headquarters to complain about the Evening Tide Mate, but the Evening Tide Mate remained assigned to the Evening Tide and commenced a new three-week stint as the mate on April 24, 2003.

19. The Evening Tide Mate experienced more difficulties shortly after midnight on April 27, 2003, a little more than twelve hours before the oil spill occurred. At this time, the Evening Tide Mate improperly released the starboard side tow wire off the stern of the Evening Tide, causing it to tangle and rendering it inoperable. The cost of repairing the damage caused to the starboard side tow wire as a result of this incident was several thousand dollars. The Evening Tide was still able to tow the B-120 barge by switching to the port side tow wire.

### The Oil Spill

20. The weather on the afternoon of April 27, 2003 was beautiful; it was a bright and clear day, with winds at 10-15 knots out of the North. The sea swells that day were running three to five feet in a southwesterly direction. All the navigational, communications, mechanical and steering equipment systems aboard the Evening Tide were in good working order throughout that day.

21. On April 27, 2003, the Evening Tide Mate was in charge of the vessel during the noon to 6:00 p.m. shift. The Evening Tide Captain was off-duty for that shift. The Evening Tide approached the entrance to Buzzards Bay Channel, as delineated by the first of a series of

red and green navigational buoys which clearly mark the channel, at approximately 4:30 p.m. The first navigational buoy a ship encounters as it enters the Buzzards Bay Channel from the south is a green navigational buoy located at 41-25-48 degrees North and 071-02-18 degrees West (hereinafter "the First Buzzards Bay Buoy"). All of these navigational buoys, as well as the hazards in Buzzards Bay and the depths of the various rocky shoals in this area, are clearly marked on the widely used navigational charts published by the National Oceanic and Atmospheric Administration ("NOAA"). These NOAA charts for Buzzards Bay were on-board the Evening Tide on April 27, 2003, both in paper form and on the navigational software installed on the ship's computer.

22.     As the Evening Tide was approaching the entrance to Buzzards Bay Channel it was towing the B-120, using the steel cable off the stern of the Evening Tide, which was connected to a cable wire off the bow of the B-120. At this time, the length of the cable wire connecting the Evening Tide to the B-120 was approximately 1,200 feet.

23.     A second tug boat, the Carl Ray, which is owned and operated by a different company, was also traveling northwards towards Buzzards Bay Channel on the afternoon of April 27, 2003. Like the Evening Tide, the Carl Ray was towing a barge loaded with oil. The Carl Ray was approximately two nautical miles behind the Evening Tide, to its southeast.

24.     Prior to reaching the entrance to Buzzards Bay Channel, at approximately 4:10 p.m., the mate on the Carl Ray attempted to contact the Evening Tide several times. After initially not receiving a response, he spoke with the Evening Tide Mate and stated that the Carl Ray would be slowing down to shorten its tow wire.

25. Shortly thereafter, the captain of the Carl Ray, who joined his mate in the wheelhouse of the Carl Ray, observed the route the Evening Tide was traveling as it approached the First Buzzards Bay Buoy. The captain of the Carl Ray initiated radio contact with the Evening Tide because the Evening Tide was approaching the Buzzards Bay Channel at the extreme left-hand side of the channel instead of heading for the center of the channel, as is customary. The captain of the Carl Ray was very concerned that the Evening Tide was approaching more shallow areas of Buzzards Bay, punctuated by several reefs, which exist just outside the marked channel. Immediately to the west of the First Buzzards Bay Buoy is an area of several rocky reefs that lie 22 feet below the surface. By contrast, the depths within the marked Buzzards Bay Channel range between 42 and 63 feet.

26. The captain of the Carl Ray, despite efforts to reach the Evening Tide over the radio for several minutes, was unable to reach anyone on the Evening Tide because the Evening Tide Mate failed to maintain radio communications. For the second time that afternoon, no one aboard the Evening Tide responded promptly to the repeated attempts by the Carl Ray to communicate via the radio. As a result, the Evening Tide Mate missed the warnings from the Carl Ray that the Evening Tide was off course.

27. The Evening Tide Mate's conduct, in failing to assign a crew member to relieve him in the wheelhouse and monitor the radio, violated the Evening Tide's "Watch Standing Orders" issued by Evening Tide captain Jon Richardson in January 2001. Among other things, these standing orders, which were aboard the Evening Tide on April 27, 2003, stated that the mate or captain shall "never leave the bridge UN-attended (sic) while underway or at anchor unless properly relieved."

7

28.   After several minutes, the Evening Tide Mate initiated a radio call to the Carl Ray in which the Evening Tide Mate stated that he was having difficulty bringing in his tow wire. The captain of the Carl Ray asked the Evening Tide Mate if he was where he wanted to be in the channel, in reference to the highly unorthodox approach the Evening Tide was taking. The Carl Ray received a garbled response.

29.   After this brief exchange with the Evening Tide Mate, the mate and the captain of the Carl Ray both watched closely as the Evening Tide approached the First Buzzards Bay Buoy. Each of these individuals saw the Evening Tide and the B-120 pass the First Buzzards Bay Buoy with the buoy off the starboard side of the vessels. In other words, the Evening Tide and the B-120 traveled to the west of the First Buzzards Bay Buoy, outside the well-marked Buzzards Bay Channel. According to these witnesses, the B-120 and the Evening Tide were approximately 1/4 of a mile on the far side of the First Buzzards Bay Buoy.

30.   The B-120 struck a rock outcropping to the west of the First Buzzards Bay Buoy as it traveled outside Buzzards Bay Channel. This reef is marked on the NOAA navigational charts as being at a depth of 22 feet.

31.   At the time of the accident, the Evening Tide and the B-120 were traveling at a speed of approximately 6 knots. The impact of the barge striking the rocks at this location ripped a twelve-foot long gash slightly to the starboard side of the keel line on the bottom of the B-120. The hole in the bottom of the barge, which was constructed of thick steel, was as wide as one foot at certain points and up to twenty-one inches deep. The damage caused by this collision with the reef was limited to the #2 tank on the starboard side of the B-120.

## The Impact of the Oil Spill

32.     As a result of this collision with the reef, tens of thousands of gallons of #6 oil was released into Buzzards Bay from the gaping hole in the B-120. The estimates of the size of the spill range from 22,000 gallons to 98,000 gallons.

33.     The discharge of this heavy, sticky oil was especially harmful to the fragile bird population in this area. More than 450 federally-protected birds were killed when they came into contact with the #6 oil discharged from the B-120. More than half of the birds killed by the BTC oil spill were Common Loons, Red Throated Loons, Common Eiders or Black Scoters. Oil from this spill also caused the death of a wide variety of other protected birds, including Black Backed Gulls, Dunlins, Herring Gulls, Long-tailed Ducks, Black Ducks, Buffleheads, Canada Geese, Common Terns, Gannets, Greater Scaups, Mergansers, Grebes, Swans, Razorbills, Scoters, Willets and Yellowlegs. Only a small number of birds who came into contact with the #6 oil from this spill were rehabilitated and returned to the wild.

34.     The oil spill also forced the immediate closure of thousands of acres of shellfish beds in Buzzards Bay, a large portion of which remained closed for several months following the oil spill. Oil from the B-120 affected close to 90 miles of Massachusetts beaches and coastline. The total cost of cleaning up this oil spill is still being determined and it is expected to run into the tens of millions of dollars. The long-term impact from the release of this oil into the water, in terms of marine life, the bird population and the overall ecology of Buzzards Bay will not be known for several years.

## COUNT ONE -- 33 U.S.C. §§1319(c)(1), 1321(b)(3)
### (Clean Water Act -- Negligent Discharge of Pollutant)

THE UNITED STATES ATTORNEY FURTHER CHARGES THAT:

35. Paragraphs 1-34 are realleged and incorporated by reference as though fully set forth herein.

36. On or about April 27, 2003 in Buzzards Bay, in the District of Massachusetts and elsewhere, the defendant,

### BOUCHARD TRANSPORTATION COMPANY

negligently caused the discharge of a harmful quantity of oil from its barge, the Bouchard B-120, into and upon the navigable waters of the United States.

All in violation of Title 33 U.S.C. §§1319(c)(1) and 1321(b)(3).

## COUNT TWO- 16 U.S.C. §§703 and 707(a)
(Migratory Bird Treaty Act)

THE UNITED STATES ATTORNEY FURTHER CHARGES THAT:

37.   Paragraphs 1-34 are realleged and incorporated by reference as though fully set forth herein.

38.   On or about April 27, 2003 in Buzzards Bay, in the District of Massachusetts and elsewhere, the defendant,

BOUCHARD TRANSPORTATION COMPANY

without being permitted to do so by regulation as required by law, did kill migratory non-game birds.

All in violation of the Migratory Bird Treaty Act, Title 16, U.S.C. §§703 and 707(a) and Title 50, *Code of Federal Regulations*, §21.11.


MICHAEL J. SULLIVAN
United States Attorney

By: _____
Jonathan F. Mitchell
Nadine Pellegrini
Assistant U.S. Attorneys

Peter Kenyon
Senior Criminal Enforcement Counsel
Environmental Protection Agency

Dated: October 22, 2004

CERTIFICATE OF SERVICE

This is to certify that I have this day served upon the person listed below a copy of the foregoing document by fax and mailing a copy of same:

>Ronald J. Zdrojeski, Esq.
>LeBoeuf, Lamb, Greene & McRae, LLP
>225 Asylum Street, 13th Floor
>Hartford, CT 06103
>(860) 985-3026

This 22th day of October, 2004.

_____
JONATHAN F. MITCHELL
ASSISTANT UNITED STATES ATTORNEY

12